NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

KATHLEEN J. PASTUCH,

          Plaintiff,

v.

COMMISSIONER OF SOCIAL
SECURITY,

          Defendant.

Civ. No. 17-989

**OPINION**

RECEIVED

MAY 0 1 2018

AT 8:30_____M
WILLIAM T. WALSH
CLERK

THOMPSON, U.S.D.J.

## INTRODUCTION

This matter comes before the Court upon the appeal by Plaintiff Kathleen J. Pastuch ("Plaintiff") of the final administrative decision of Defendant Commissioner of the Social Security Administration ("Defendant") regarding Plaintiff's claim for Social Security disability insurance benefits and supplemental security income ("SSI"). (ECF No. 1.) The Court has decided this appeal based on the submissions of the parties without oral argument pursuant to Federal Rule of Civil Procedure 78(b). For the reasons set forth herein, the Court will remand for further consideration consistent with this Opinion.

## BACKGROUND

This case concerns Plaintiff's application for disability benefits.[1] At the time of alleged disability onset, Plaintiff was a 47-year-old woman reportedly unable to work due to symptoms from physical and psychological impairments. (R. at 17, 24, 39, 93.) Her conditions included degenerative disc disease of the cervical spine at C3-C4 and C4-C5 and of the lumbar spine at

---

[1] All citations formatted as "R. at ___" refer to the Administrative Record (ECF No. 14), provided by Defendant pursuant to Local Civil Rule 9.1(c)(2).

1

L5-S1; bilateral shoulder tendonitis; asthma; hypothyroidism; and mental health issues including anxiety disorder, panic attacks, and major depression. (R. at 14, 18, 96, 202.)

Plaintiff has a high school degree, with some online college courses. (R. at 39, 203, 292.) She has worked in office positions. (R. at 23, 39–43, 204, 218–25.) Between 2007 and February 2013, she worked as an administrative assistant for a production manager at Distek Inc. (R. at 39, 187–89, 204.) She spent the prior ten years as a receptionist, in systems administration, and in accounts payable for United Natural Foods. (R. at 39–41, 186–89, 204). In March 2012, Plaintiff had a car accident which kept her out of work until July 2012. (R. at 18, 44.) Her anxiety and physical limitations increased from the accident. (R. at 44–45, 53, 294, 306, 309.) Between her return to work in July 2012 and February 2013, Plaintiff had trouble meeting deadlines, following directions, and maintaining focus. (R. at 44–46; *see also* R. at 203, 225.) She was let go on February 28, 2013 (R. at 44, 46–47, 63–64) and has not worked since (R. at 39).

In April 2013 and December 2014, respectively, Plaintiff filed applications for disability insurance benefits and SSI, alleging a disability onset date of February 28, 2013. (R. at 11, 93, 106–07, 183–84.)[2] On August 21, 2013, Plaintiff's disability application was denied. (R. at 125–29.) Reconsideration was likewise denied. (R. at 134–39.) Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (R. at 141–47.) On April 28, 2015, ALJ Beth Shillin conducted a comprehensive hearing with Plaintiff, represented by counsel, where Plaintiff explained the timeline of her disability, work history, limitations, and abilities. (*See* R. at 31–92.)

## I.      Plaintiff's Testimony, Submissions, and Claimed Disabilities

Plaintiff claims physical and psychological impairments that render her disabled. Plaintiff's undated Disability Report listed the following medical conditions: severe anxiety

---

[2] Plaintiff's application for SSI does not appear in the record but is referenced in the decision by Administrative Law Judge Beth Shillin. (Def.'s Br. at 2 n.1, ECF No. 19.)

disorder, panic attacks, major depression, hypothyroidism, and asthma. (R. at 202.) At the time, she was taking Advair and ProAir for asthma, Klonopin for anxiety, Levothroid for hypothyroidism, and Lexapro for anxiety and depression. (R. at 205.) She reported receiving treatment from Dr. Ranjit Mitra for anxiety disorder, panic attacks, and major depression from May 2007 until 2009. (R. at 206.) She reported receiving treatment for anxiety, depression, hypothyroidism, asthma, and borderline diabetes from Dr. John Joseph Smith beginning at an unknown time (indicated with a question mark), with her last visit in February 2013. (R. at 206.)

At the hearing, Plaintiff testified to shoulder pain, exacerbated by the March 2012 car accident. (R. at 44–46.) Thanks to injections she received, her accident-related back pain improved by December 2012, and her back was pain-free until shortly before the hearing, although it gets stiff when she sits for too long. (R. at 18, 48, 294.) Plaintiff needs to stand up and stretch for 10 to 15 minutes for every 45 minutes she is seated or her legs become numb. (R. at 49.) She experiences pain when reaching with her left, non-dominant hand that radiates from her shoulder down to her elbow. (R. at 49–50.)

Plaintiff testified that she first experienced anxiety and panic attacks at age five, has experienced anxiety and depression throughout her adult life, and occasionally the attacks cause her to pass out. (R. at 58, 62–63.) In her last job, she passed out during meetings (R. at 58), and she credits losing all prior jobs to issues with managing stress and anxiety (R. at 59). Plaintiff's anxiety makes social interaction difficult; when coworkers approached her unannounced, she would "lash out, jump out of [her] chair." (R. at 52; *see also* R. at 203 ("Due to the anxiety disorder [she] began to make simple mistakes repeatedly due to being in an open area where people could walk up on [her] without [her] knowing."); R. at 225.) The car accident increased her anxiety. (R. at 44–46.) She stopped driving in 2014 due to stress. (R. at 53–54, 229, 290.)

3

At the time of the hearing in 2015, Plaintiff lived in an apartment with her boyfriend, Douglas, and his mother. (R. at 54–55.) She and Douglas were roommates and friends before becoming involved. (R. at 55.) Soon after the hearing, Plaintiff, Douglas, and his mother all moved into a house together. (R. 55–56, 182). Plaintiff testified that she cooks and goes grocery shopping if someone accompanies her, provided she can go off hours and get out of the store quickly. (R. at 65–66; *see also* R. at 233.)

After losing her job, Plaintiff volunteered as the caretaker of a friend's autistic, home-schooled 13-year-old child. (R. at 68.) She ensured he took his medication in the morning and made him lunch; when he re-entered the school system, she drove him to school. (R. at 69–70.) She was only able to drive him to school for a two-month period at the end of 2013 before it became too stressful. (R. at 70.) Plaintiff testified that she does not leave the house for meetings or activities, like church, going to a movie, or eating at a restaurant. (R. at 66–67.)

In her April 2013 Adult Function Report, Plaintiff attested to taking care of her cats, watching television, reading, and using a computer. (R. at 226–27, 229.) She cooks but no longer enjoys it, does laundry, and washes dishes. (R. at 228). She rarely goes outside because of her panic attacks and anxiety. (R. at 228–30.) She is able to handle her own finances. (R. at 229.) Her impairments cause difficulties with memory, concentration, following instructions, and getting along with others. (R. at 231.) She has difficulty being around people, mostly strangers and crowds, and is unable to concentrate. (R. at 227, 230.) She is good at following written instructions, but struggles with verbal instructions—both understanding and remembering them. (R. at 231.) She gets along well with authority figures provided they are not yelling or threatening. (R. at 232). She handles stress very poorly, handles changes in her routine very poorly, and has unusual behaviors of shaking and scratching or clawing her skin. (R. at 232.)

4

Plaintiff's boyfriend (then-friend and roommate) completed a third party function report in May 2013, confirming that Plaintiff cares for her cats and regularly uses a computer. (R. at 210). He wrote that Plaintiff drives him to medical appointments and the pharmacy, although she remains in the car, and shares household chores. (R. at 211, 214). She cannot be in crowded places, has restless and disrupted sleep, sometimes needs encouragement to eat because of depression, sometimes needs reminders to take medication on days when she feels ok, and has difficulties with memory, concentration, understanding, and completing tasks. (R. at 211–16.)

## II. Medical Evidence Considered by the ALJ: Treating Medical Professionals

### A. Dr. Ranjit Mitra, M.D., Treating Psychiatrist (2007–2009)

Plaintiff regularly visited Dr. Ranjit Mitra, M.D., from May 2007 to February 2009. (R. at 274–82.) Dr. Mitra's records are largely illegible handwritten notes. ALJ Shillin extrapolated "these records reflect only changes to the claimant's medications and do not suggest any impairment in her functioning or exacerbation of her anxiety. Mostly, these treatment records reflect a history of medication refills and do not report any substantive findings." (R. at 20.)

The Court notes that Dr. Mitra first diagnosed Plaintiff's mental health conditions. At the first visit in May 2007, Plaintiff's chief complaints related to her mood and panic attacks (R. at 274), and Dr. Mitra diagnosed Plaintiff with general anxiety disorder and depression, found her Global Assessment of Functioning ("GAF") score was 50, and prescribed Klonopin (a sedative) and another medication (R. at 275). Plaintiff never demonstrated suicidal or homicidal ideation and at each visit Dr. Mitra continued her medicine regimen. (R. at 276–82.)

### B. Dr. Serge Menkin, M.D., Post-Accident Treating Specialist (2012)

After her March 2012 car accident, Plaintiff sought treatment from Dr. Serge Menkin, M.D., at the Center for Joint and Spine Relief. (R. at 286–87.) She reported headaches, neck and

5

lower back stiffness, and numbness and tingling in her upper extremities on May 10, 2012.[3] (R. at 286.) She also reported anxiety, worsening depression, and difficulty with sleep. (R. at 286.) Plaintiff said she had been undergoing physical therapy, acupuncture, and chiropractic therapy post-accident. (R. at 286.) She reported difficulty with daily activity due to pain. (R. at 286.) She had been taking Skelaxin (a muscle relaxant) and Diclofenac (a non-steroidal anti-inflammatory drug ("NSAID")) without significant relief of symptoms as well as undergoing therapy with modest, temporary relief of symptoms. (R. at 286.) She rated her pain 8/10 on the Visual Analog Scale and reported limitations in range of motion of the left shoulder, lower back pain with radiation, and paresthesias in bilateral upper extremities, worse on the left. (R. at 286.)

On physical examination, Dr. Menkin observed antalgic gait; limited range of motion in her cervical spine, shoulders, and lower back; positive signs on cervical and lumbar facet loading maneuvers; severely decreased range of motion on the left side; and that Plaintiff required assistance to and from the exam table. (R. at 287.) Dr. Menkin diagnosed bilateral shoulder tendonitis, left shoulder adhesive capsulitis, left cervical radiculopathy, and lumbar sprain. (R. at 287.) He recommended ongoing physical therapy; Mobic (an NSAID), Robaxin (a muscle relaxant), and Percocet (an opioid) for pain; and a left shoulder MRI to rule out a rotator cuff tear. (R. at 287.) The records were forwarded to Plaintiff's Primary Care Physician ("PCP"), Dr. John Joseph Smith, M.D., on May 24, 2012. (R. at 288.)

### C. Dr. John Joseph Smith, M.D., Primary Care Physician (through 2013)

The records provided from Plaintiff's PCP are sparse. Plaintiff underwent routine testing on March 17, 2011, including a metabolic panel, thyroid function panel, and urinalysis. (R. at 283–85.) Plaintiff had another appointment with Dr. Smith on August 22, 2012. (R. at 289.)

---

[3] The notes describe it as a "Follow-Up Patient Visit." (R. at 286 ("The patient returns for re-evaluation of symptoms related to a motor vehicle accident on March 23, 2012.").)

***D. Dr. Kathleen Waldron, Ph.D., APN-C, Psychologist (Jan. 2014–Apr. 2015)***

Dr. Kathleen Waldron, Ph.D., APN-C, performed an intake outpatient psychiatric evaluation on January 10, 2014. (R. at 306–09.) Plaintiff reported that she had been a severe alcoholic from age 18 until in 2007 she went to the Trinitas emergency room, they determined she was self-medicating anxiety with alcohol, and they referred her to Dr. Mitra for treatment. (R. at 306, 309.) She reported that she left Dr. Mitra in 2009 because he was discontinuing her medication and telling her she no longer needed it. She then received psychiatric treatment from her PCP, who prescribed Lexapro (a Selective Serotonin Reuptake Inhibitor ("SSRI")) and increased her Klonopin dosage. (R. at 306, 309.) She stopped receiving psychiatric treatment in 2013 when she lost her job and could not afford her PCP appointments. (R. at 306, 309.)

Plaintiff reported lifelong anxiety beginning in childhood; that she lost her job in March 2013 because she was unable to focus or get things done; and that she had stress at home due to a difficult relationship with the friend's mother she lives with. (R. at 306.) "Some of her early history is contributing to her symptoms since she did not have a good relationship with her mother." (R. at 306.) Dr. Waldron noted that Plaintiff lacked suicidal or homicidal ideation or paranoia, but reported hearing "phantom noises" such as bells and knocking at night. (R. at 306.) On mental status exam, Dr. Waldron noted Plaintiff was alert and interactive; had excessively loud speech, restricted affect, partially intact insight, and depressed and anxious mood; and had intact cognition, judgment, and thought processes. (R. at 306–08.) She diagnosed recurrent and chronic major depressive disorder and anxiety disorder. (R. at 308.) She assigned a GAF score of 55 and prescribed Lexapro and Buspirone (an anxiolytic). (R. at 309.)

Although not mentioned in the ALJ's decision, Plaintiff returned to Dr. Waldron in January 2015. (R. at 310–14.) Dr. Waldron noted that Plaintiff was "less depressed and anxious

7

since we switched to Paxil CR." (R. at 310.) Dr. Waldron also noted that Plaintiff "continued to sleep well with Seroquel." (R. at 310.) Plaintiff's January 2015 mental status exam reflected normal, intact, or unremarkable markers across all categories. (R. at 311–13.) Dr. Waldron continued prescribing Paxil and Seroquel. (R. at 313.) Plaintiff again returned to Dr. Waldron in April 2015. (R. at 315–18.) Plaintiff reported stress related to moving and her boyfriend's mother's surgery. (R. at 315.) Dr. Waldron wrote "the medicine has helped her to not get too anxious or depressed." (R. at 315.) The mental status exam was again normal. (R. at 316–18.) Dr. Waldron continued Plaintiff's existing prescriptions. (R. at 318.)

Dr. Waldron provided a medical source statement dated April 1, 2015. (R. at 303–05.) Using the form check boxes, she opined that Plaintiff had marked to severe limitations in her ability to interact with co-workers, supervisors, and the public, to use judgment, to function independently, to maintain attention and concentration, and to deal with workplace stress. (R. at 303.) In narrative, Dr. Waldron explained that Plaintiff "has extreme anxiety in public places. Mood can be depressed and unstable. Stress exacerbates all symptoms." (R. at 304.) Again using the check boxes, Dr. Waldron opined that Plaintiff has a fair ability to understand, remember, and carry out simple instructions, but poor ability to understand, remember, and carry out detailed or complex instructions. (R. at 304.) In narrative, she noted Plaintiff's "poor coping skills." (R. at 304.) Using the check boxes in a final section, Dr. Waldron assessed moderate to marked limitations in Plaintiff's ability to make personal social adjustments, explaining in narrative "Client has difficulty with social interactions." (R. at 304–05.)

### E.  Dr. Juhee Gupta, M.D., Primary Care Physician (May 2014–Apr. 2015)

Dr. Juhee Gupta, M.D., treated Plaintiff regularly between May 2014 and April 2015, and the Record includes partly legible handwritten notes memorializing those visits. (R. at 320–55.)

In a patient history taken on May 5, 2014,[4] Dr. Gupta noted that Plaintiff reported receiving steroid injections in her left shoulder after her 2012 accident as well as to treat a herniated disc in her neck and lumbar spine. (R. at 340.) She complained of migraines, hypothyroidism, diabetes II, asthma, and chronic bronchitis; she reported smoking a half-pack of cigarettes per day. (R. at 340.) After conducting bloodwork, he prescribed Synthroid for hypothyroidism. (R. at 340–42.)

Plaintiff returned to the office on May 30, 2014 to discuss her blood work results, and reported difficulty with sleeping, anxiety, constipation, dry skin, and migraine headaches once per month. (R. at 342.) An APN-C in Dr. Gupta's office noted Plaintiff denied taking any medication "except her bipolar and anxiety medications prescribed by her psychiatrist Dr. Waldron." (R. at 342.)[5] Plaintiff was described as not in acute distress after her physical exam. A treatment plan, including medications, was prepared for hypothyroidism, hyperlipidemia, migraines, and Vitamin D deficiency. (R. at 343.)

Handwritten notes dated June 2014 to April 2015 confirm Plaintiff's continuing visits to Dr. Gupta's office and medication regimen.[6] (R. at 320–55.) Plaintiff had a battery of tests regarding pulmonary function on June 6, 2014. (R. at 334–39.) On June 20, 2014, Plaintiff returned for blood work, not in any acute distress, and reported two migraine attacks since her last visit. (R. at 344.) Dr. Gupta's office prescribed Fioricet for migraines in addition to her continuing prescriptions. (R. at 344.) Plaintiff complained of fatigue in August 2014 (R. at 331), and Dr. Gupta recommended a sleep study and a sleep machine, pending authorization. (R. at

---

[4] This visit is called a "check up" and appears to be the oldest visit with Dr. Gupta in the Record.
[5] Throughout Dr. Gupta's notes, there are many references to "bipolar" (*see, e.g.*, R. at 320, 321, 323, 325, 326, 342, 348, 351, 352), but it appears this may be an inference (and not a diagnosis) based on Plaintiff's psychiatric medications of Seroquel and Paxil.
[6] The ALJ decision did not cite or discuss any of Dr. Gupta's records or notes.

9

345–46; *see also* R. at 333 (results of the August 2014 sleep apnea study).) On October 29, 2014, Plaintiff remained pending approval for a CPAP machine. (R. at 350.)

On November 7, 2014, Plaintiff complained of left neck and left arm pain. (R. at 350.) Dr. Gupta noted Aleve was not effective in reducing her pain and prescribed 500 mg Naproxen (an NSAID). (R. at 325.) Eleven days later, Dr. Gupta noted that she had chronic left shoulder pain and takes Naproxen for relief, and that x-rays and MRI were benign. (R. at 351.) She had normal range of motion in all extremities. (R. at 351.) In December 2014, Plaintiff again reported left shoulder pain, noted as stable with Naproxen. (R. at 352.) Dr. Gupta referred her for an ultrasound of her neck. (R. at 324, 352.) The December 2014 thyroid ultrasound revealed three solid nodules in the vicinity of her upper right thyroid gland lobe. (R. at 332.)

Plaintiff reported a March 2015 fall resulting in lacerations, a sprained left wrist, and bruised left ribs; she went to the emergency room and received seven staples on her scalp. (R. at 320, 355). Plaintiff reported rib pain when taking deep breaths. (R. at 320.) Dr. Gupta x-rayed her ribs, prescribed Motrin, gave her a tetanus shot, and wrapped her wrist. (R. at 320, 355.)

### III.   Medical Evidence Considered by the ALJ: State Agency Doctors

#### *A.   Dr. Joseph DiLallo, M.D., Physical Consultative Examiner (June 2013)*

Dr. Joseph DiLallo, M.D., performed a physical consultative examination in June 2013. (R. at 294–300.) Plaintiff complained of depression, anxiety, panic attacks, borderline diabetes (controlled with diet), back pain secondary to her March 2012 car accident, and a history of mild asthma. (R. at 294.) She reported inconsistent medications due to a lack of funds and difficulty getting to doctors. (R. at 294.) She had gained 30 pounds in the last year. (R. at 294.)

During the review of symptoms, Plaintiff reported fairly good range of motion, occasional cervical spine and back pain, occasional stiffness and tenderness in her neck and

10

back, no joint deformities, good grip strength, intact fine and gross manipulation, no generalized muscle weakness, intact sensation, some (not excessive) fatigue, a chronic but not extreme sleep problem, and no coordination or balance difficulties. (R. at 295.) Dr. DiLallo found mild, very localized tenderness in the lumbosacral muscles and spine. (R. at 295–96.) Plaintiff reported that her asthma attacks were generally very mild (R. at 296), but the worst one ever was recent, in October 2012, and required a visit to the emergency room (R. at 294). Dr. DiLallo noted that Plaintiff was not extremely anxious or depressed at the time of the examination (R. at 295–96), but also emphasized her history of lifelong major depression, chronic anxiety attacks and panic attacks, and that she believed her disability was "psychiatric" (R. at 294, 296–97).[7]

Dr. DiLallo opined that Plaintiff can sit for 30 minutes and stand for 15–20 minutes before developing a pinching sensation in her nerves, and that she claimed she could lift and carry 10 pounds. (R. at 297.) While he described her bending as "good," he noted that crouching, squatting, and stooping were "fair." (R. at 297.) Dr. DiLallo determined that Plaintiff's "history of chronic depression and anxiety attacks . . . seem to interfere with her activities of daily living and would interfere with her work situation. She needs a sedentary clerical low-stress type of job. There is no absolute contraindication to gainful employment at this time." (R. at 297.)

### B. Dr. Vasudev N. Makhija, M.D., Psychiatric Consultative Examiner (July 2013)

Dr. Vasudev Makhija, M.D., performed a psychiatric consultative examination in July 2013. (R. at 290–93.) Plaintiff reported recurrent panic attacks since the age of five sometimes causing her to pass out; constant anxiety (debilitating in crowded places); recurrent, chronic depression which made her lose interest in everything; and difficulty sleeping. (R. at 290–91.)

---

[7] Dr. DiLallo's handwritten notes suggest Plaintiff commented "don't care about myself" and "don't want to interact with people," as well as "Isolates, gets meltdown – scratches self." (R. at 298.) He noted one instance of suicidal ideation, providing an illegible specific date. (R. at 298.)

She reported one psychiatric hospitalization at age 18 at Trinitas Hospital caused by stress after her grandmother's death (R. at 291) and outpatient psychiatric treatment from 2007–2009 with Dr. Mitra, who prescribed Klonopin (R. at 291). She left Dr. Mitra's practice because she was not comfortable with him. (R. at 291.) She was taking Lexapro from leftover prescriptions, but could not access Klonopin because she could not afford to see her PCP. (R. at 291–92.)

On mental status examination, Dr. Makhija found Plaintiff to be cooperative and pleasant; posture and gait were unremarkable; speech was rapid but appropriate and coherent; affect was appropriate to thought content; mood was anxious, cheerful, tense, and at times slightly depressed; and thoughts were goal directed. (R. at 293.) Dr. Makhija further found ability to comprehend and follow instructions; intact remote and short-term memory; orientation to time, place, and person; ability to recall three out of three objects after five minutes; and limited fund of knowledge. (R. at 293.) He diagnosed Plaintiff with panic disorder with agoraphobia, generalized anxiety disorder, and dysthymic disorder. (R. at 293.) He opined that Plaintiff was capable of handling benefit funds in her own best interest. (R. at 293.)

### C. Dr. Seung Park, M.D., State Agency Doctor, Physical RFC (Sept. 2013)

On September 18, 2013, state agency doctor Seung Park, M.D., prepared a physical residual functional capacity ("RFC") assessment after reviewing Plaintiff's medical records. (R. at 112–14, 301). He reported that Plaintiff "has depression and back pain due to MVA in 3/2012." (R. at 114, 301.) He noted that her lumbar spine had very mild localized tenderness but she had normal gait. (R. at 301.) He affirmed that she was credible and her pain was supported by the medical evidence. (R. at 114, 301.) He agreed with the initial decision (*see* R. at 98–101 (signed by Deogracias Bustos, specialty code 19 indicating internal medicine specialty))—that she was impaired and had a decreased RFC and affirmed it as written. (R. at 114, 301.) The

12

initial RFC reflected that Plaintiff could lift or carry 20 pounds occasionally and 10 pounds frequently; could stand, sit, or walk for six hours in an eight-hour workday, with unlimited pushing and pulling in her extremities (R. at 99; R. at 112 (affirming)), postural limitations, no manipulative limitations, and environmental limitations (R. at 99–101; R. at 113–14 (affirming)).

### *D. Dr. Robert Campion, M.D., State Agency Psychiatrist, Mental RFC (Oct. 2013)*

In October 2013, state agency psychiatrist Robert Campion, M.D., prepared a mental RFC assessment after reviewing Plaintiff's medical records. (R. at 110–11, 114–16). He did not alter the analysis provided by Jane Shapiro at the initial level of determination (*see* R. at 97–98, 101–02); he wrote "I have reviewed all the evidence in file - there is no new psychiatric evidence on recon [sic] - and I affirm the DDS assessment of July 22, 2013, as written." (R. at 111, 116.)

At the initial level, Jane Shapiro—who appears to be a clinical psychologist according to public records—assessed moderate limitations to Plaintiff's ability to carry out detailed instructions and maintain attention and concentration for extended periods, but otherwise no significant limitations to concentration, persistence, or pace; marked limitations to Plaintiff's ability to interact appropriately with the general public; moderate limitations to Plaintiff's ability to accept instructions and respond appropriately to criticism from supervisors; and moderate limitations to Plaintiff's ability to respond to changes in the work setting. (*See* R. at 101–02.) She found Plaintiff could attend and concentrate and complete routine tasks (R. at 101; *see also* R. at 115); interact appropriately with supervisors in low contact work (R. at 102; *see also* R. at 115); and adapt to modest changes in the workplace (R. at 102; *see also* R. at 116).

### IV. Mary D. Anderson, Vocational Expert Testimony Considered by the ALJ

ALJ Shillin requested the testimony of Mary D. Anderson, Vocational Expert ("VE"). (R. at 174.) ALJ Shillin asked the VE to assume an individual of Plaintiff's age, education, and work

13

experience who could lift and carry up to 20 pounds occasionally and 10 pounds frequently; could stand, sit, or walk for six of eight hours; could occasionally reach overhead; could not use ladders, ropes, scaffolds, or heavy machinery; could occasionally use ramps and stairs; could occasionally kneel, crouch, crawl, or balance; could have occasional exposure to extreme heat, cold, environmental pollutants, high ambient noise, or high vibration; and could have no exposure to unprotected heights. (R. at 72.) She then added limitations to social interaction: no contact with the general public and only occasional contact with co-workers and supervisors. (R. at 72.) In response, the VE testified that Plaintiff could not perform any of her past relevant work (R. at 72), but could perform other jobs in the national economy, such as a small parts assembler or bander (R. at 73). The ALJ added the restriction of no reaching in any direction and occasional fingering and feeling with the non-dominant hand, and the VE initially testified there were no jobs, but at the ALJ's prompting, agreed that a surveillance system monitor was the only job at the sedentary level that met all the limitations. (R. at 76–77.) After Plaintiff's counsel emphasized the need for a condition of low stress, the VE affirmed that the previously identified jobs were low stress, especially the bander. (R. at 88–89.)

## V.    Procedural History

ALJ Shillin issued a decision on July 15, 2015, denying disability based on Plaintiff's RFC to perform work available in sufficient numbers in the national economy. (R. at 8–29.) Plaintiff sought review with the Appeals Council of the Social Security Administration, which denied Plaintiff's request on December 13, 2016, finding no reason to review or reconsider the ALJ's decision. (R. at 1–6.) Plaintiff filed the present appeal of the final agency decision on February 14, 2017. (ECF No. 1.) After Defendant submitted the administrative record in lieu of an answer (ECF No. 14), Plaintiff filed her brief on October 17, 2017 (ECF No. 18). Defendant

14

replied with its brief pursuant to Local Civil Rule 9.1 on December 1, 2017. (ECF No. 19.) Plaintiff did not submit a reply. The Court now considers the appeal.

## STANDARD OF REVIEW

Social Security appeals are reviewed under 42 U.S.C. § 405(g), which empowers this Court to enter "a judgment affirming, modifying or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). This Court has plenary review over legal issues and applies a "substantial evidence" standard of review to the ALJ's factual determinations. *Id.*; *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "Despite the deference to administrative decisions implied by this standard, appellate courts retain a responsibility to scrutinize the entire record and to reverse or remand if the Secretary's decision is not supported by substantial evidence." *Smith v. Califano*, 637 F.2d 968, 970 (3d Cir. 1981). Substantial evidence requires "more than a mere scintilla" of support, *Richardson*, 402 U.S. at 401, or "such relevant evidence as a reasonable mind might accept as adequate," *Thomas v. Comm'r of Soc. Sec. Admin.*, 625 F.3d 798, 800 (3d Cir. 2010), but "it need not rise to the level of a preponderance," *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004).

Where the Commissioner's factual findings are supported by substantial evidence in the record, the Court may not set aside such determinations even if the court might have decided the inquiry differently. 42 U.S.C. § 405(g); *see, e.g., Hagans v. Comm'r of Soc. Sec.*, 694 F.3d 287, 292 (3d Cir. 2012); *see also Holley v. Colvin*, 975 F. Supp. 2d 467, 475 (D.N.J. 2013) ("The presence of evidence in the record that supports a contrary conclusion does not undermine the Commissioner's decision so long as the record provides substantial support for that decision." (quoting *Sassone v. Comm'r of Soc. Sec.*, 165 F. App'x 954, 955 (3d Cir. 2006))), *aff'd sub nom. Holley v. Comm'r of Soc. Sec.*, 590 F. App'x 167 (3d Cir. 2014).

## DISCUSSION

### I.  Legal Standard for Disability Benefits

In order to receive benefits, an applicant must establish disability within the meaning of the Social Security Act and its implementing regulations. Disability is defined as "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment."[8] 42 U.S.C. § 423(d)(1)(A); *id.* § 416(i); 20 C.F.R. § 404.1505(a). An ALJ employs a five-step evaluation for claims under the Act. *See* 20 C.F.R. § 404.1520(a). The threshold inquiry looks to (1) whether the claimant has engaged in any "substantial gainful activity" since her alleged disability onset date. *Id.* § 404.1520(a)(4)(i). Next, the ALJ considers (2) whether the claimant has any impairment or combination of impairments "severe" enough to limit the claimant's ability to work. *Id.* §§ 404.1520(a)(4)(ii), (b)–(c), .1521. If the claimant has a severe impairment, the ALJ examines the objective medical evidence to determine (3) whether the impairment matches or equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, App'x 1. *Id.* §§ 404.1520(a)(4)(iii), (d), .1525, .1526. If so, the claimant is automatically eligible for benefits; if not, the ALJ determines (4) whether the claimant is unable to return to her past relevant work. *Id.* § 404.1520(a)(4)(iv), (f), 404.1560(b); *Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88, 92 (3d Cir. 2007) (internal citations omitted). At step five, the burden shifts to the ALJ to consider and show (5) whether the claimant can perform other work based on her RFC, age, education, and work experience. 20 C.F.R. § 404.1520(a)(4)(v), (g); *Poulos*, 474 F.3d at 92.

### II.  The ALJ's Findings and Final Determination

Following the five-step procedure, ALJ Shillin concluded as follows: (1) Plaintiff had not engaged in substantial gainful activity from her alleged onset date of February 28, 2013 (R. at

---

[8] "Substantial gainful activity" refers to jobs that exist in large numbers in the region where the claimant lives or nationwide. 42 U.S.C. § 423(d)(2)(A); *see also* 20 C.F.R. § 404.1520(a)(4)(i).

14); (2) Plaintiff had severe medically determinable impairments of degenerative disc disease of the cervical and lumbar spine, bilateral shoulder tendonitis, asthma, an anxiety disorder, and an affective disorder, as well as the non-severe impairment of hypothyroidism (R. at 14); (3) Plaintiff did not have an impairment or combination of impairments that met or equaled listings 1.00 (musculoskeletal system), 3.03 (asthma), 12.04 (affective disorders), or 12.06 (anxiety disorders) (R. at 14–17); (4) Plaintiff could not perform any of her past relevant work (R. at 23); and (5) Plaintiff had the RFC to perform light work, but was limited to jobs that are lower stress (consistency at a production rate, but with a lower rate of required output than other jobs) which permit no contact with the general public (and only occasional contact with supervisors and coworkers) (R. at 17–23), such as a "bander" or "small parts assembler" (R. at 24–25). The ALJ found Plaintiff was not disabled from February 28, 2013 through the date of decision. (R. at 25.)

## III.    Analysis of the ALJ's Determination

Plaintiff presents two umbrella arguments on appeal: (i) the ALJ improperly evaluated the medical evidence at step three and beyond, failing to incorporate all of Plaintiff's physical and mental impairments in the decisional RFC, and (ii) the ALJ committed legal error in questioning the VE at step five. Plaintiff asks this Court to reverse the ALJ's decision or remand for further consideration. (Pl.'s Br. at 1, ECF No. 18.)

### A. Evaluation of the Medical Evidence for Plaintiff's RFC

In evaluating medical evidence, a treating physician's opinion must be given "controlling weight" if it is well supported by medical techniques and not inconsistent with substantial evidence in the case record. *Fadly v. Colvin*, 2014 WL 2889641, at \*6 (D.N.J. June 25, 2014) (quoting *Johnson v. Comm'r Soc. Sec.*, 529 F.3d 198, 202 (3d Cir.2008)), *aff'd sub nom. Elfadly v. Comm'r Soc. Sec.*, 588 F. App'x 93 (3d Cir. 2014). "[A] longtime treating physician's opinion

17

carries greater weight than that of a non-examining consultant . . . ." *Brownawell v. Comm'r of Soc. Sec.*, 554 F.3d 352, 357 (3d Cir. 2008) (citing *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000); *Dorf v. Bowen*, 794 F.2d 896, 901 (3d Cir. 1986)). An ALJ may "reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." *Morales*, 225 F.3d at 317–18 (internal citations and quotations omitted). The ALJ must not ignore the opinions of treating professionals or cherry pick evaluations, diagnostics, or opinions that support a particular conclusion. *See, e.g., Holley*, 590 F. App'x at 169 (affirming that substantial evidence supported the ALJ's finding of residual functional capacity where "[t]he ALJ did not misinterpret or ignore the reports of any physician" or "put words in their mouths"); *Brownawell*, 554 F.3d at 356–57 (reversing and remanding where the ALJ "ignored" opinions of treating physicians and rejected one opinion "in large part on evidence that does not exist"); *Dorf*, 794 F.2d at 902 (reversing and remanding where the ALJ "improperly ignored" clinical findings of the treating physician).

1.  Assessment of Physical Impairments & Treating Sources

Plaintiff argues that the decisional RFC is not supported by substantial evidence because "the combination of disc disease at two cervical levels and one lumbar level combined with chronic tendonitis in both shoulders do not translate into any restriction whatsoever in plaintiff's ability to stand, walk, bend, use both arms to reach, feel or handle." (Pl.'s Br. at 11; *see also id.* at 19–20.) In determining the extent of Plaintiff's musculoskeletal limitations, ALJ Shillin considered Plaintiff's treatment with Dr. Menkin post-accident, examination by state agency doctor Joseph DiLallo in 2013, her own observations of Plaintiff during the hearing,[9] and

---

[9] Plaintiff argues that the ALJ engaged in improper "sit and squirm" analysis (Pl.'s Br. at 12 n.3); Defendant responds that an ALJ's lay observations are permissible as an element of a credibility determination (Def.'s Br. at 16–18). The Court concurs with Defendant. *See Holley*, 975 F. Supp. 2d at 480–81 (declining to reverse where ALJ's observations were a part of credibility analysis).

Plaintiff's self-reports of activities of daily living in testimony and functional reports. (R. at 18–20.) However, ALJ Shillin's decision seemed to reject objective medical evidence from treating physicians regarding the severity of Plaintiff's pain and limitations to her range of motion.

ALJ Shillin wrote that "[a] careful review of the claimant's medical records indicates she has received no treatment for her shoulders or back impairments since her alleged date of disability." (R. at 18.) She further explained, "[c]onsidering . . . the lack of evidence of consistent treatment for her chronic pain, I find the claimant's symptoms were not as limiting as she alleged." (R. at 19.) These conclusions did not seem to be supported by substantial evidence. For example, in Dr. DiLallo's 2013 examination of Plaintiff, he filled out a Passive Range of Motion Chart. (R. at 299–300.) His findings reflected that Plaintiff did not have problems with range of motion of the cervical spine (R. at 299), but did have significantly reduced range of motion for flexion-extension and lateral flexion of her left lumbar spine (scoring 20 out of 90), as well as mid-ranging straight leg raising tests in both the supine and sitting positions (60–70 out of 90) (R. at 300). This reflects only some improvement from May 2012, when Dr. Menkin reported, among other negative musculoskeletal findings, "[s]everely decreased range of motion on the left side. 0 to 90 degrees abduction and forward flexion on right side. Range of motion is functional 0 to 150 degrees, abduction and forward flexion." (R. at 287.) Furthermore, Dr. Park documented that Plaintiff reported back pain on July 31, 2013, and determined that Plaintiff was "credible" and that her pain and allegation were "grossly supported" by the medical evidence. (R. at 114, 301.) ALJ Shillin did not cite the longitudinal treatment notes of Plaintiff's PCP from 2014–2015, Dr. Gupta. His notes reflect that in November and December 2014, Plaintiff complained of left shoulder and neck pain and was prescribed Naproxen when Aleve was "not effective." (R. at 325, 350–51.) Dr. Gupta described Plaintiff's pain as "chronic." (R. at 351.)

ALJ Shillin gave Dr. DiLallo's opinion limiting Plaintiff to a sedentary job little weight because "nothing in Dr. Dilallo's [sic] objective findings and observations of the claimant supports a limitation to a sedentary residual functional capacity." (R. at 21.) The ALJ focused on Dr. DiLallo's positive findings regarding Plaintiff's muscle strength, grip strength, fine and gross manipulations, and normal gait, balance, and stability. (R. at 19.) However, in this portion of the decision, the ALJ described Dr. DiLallo's findings regarding range of motion as "mild" without reporting the objective results, did not mention his finding of localized tenderness in the lumbosacral area in the muscles and very mildly over the spine, and did not address his review of Dr. Menkin's treatment history regarding Plaintiff's musculoskeletal impairments post-accident. She also did not mention his comment that "[Plaintiff] can sit for ½ hour and stand for 15–20 minutes beyond which she develops nerves that feel like they are pinching." (R. at 297.) The ALJ noted that Plaintiff reported a treatment history that included epidural injections and radiofrequency ablation, but did not provide documentation substantiating the treatment. (R. at 18.) However, since 2012 Plaintiff consistently reported to her doctors having undergone physical therapy and receiving those injections. (*See, e.g.*, R. at 48, 286–87, 294, 296, 340.)

All told, the ALJ's conclusions that Plaintiff's physical limitations and pain were not as marked as her subjective reports, and that her treatment history failed to document her pain, are belied by medical evidence that supports Plaintiff's reports from the period of 2012–2015. The Court concludes that it must remand for further consideration of Plaintiff's RFC at step three.

2. Assessment of Mental Impairments & Treating Sources

Plaintiff likewise argues that the ALJ failed to translate Plaintiff's marked psychiatric impairments into the decisional RFC, substituting her own judgment for that of treating medical professionals. (Pl.'s Br. at 12–13, 16–17.) After conducting its own review of the Record, the

20

Court finds that ALJ Shillin did not sufficiently consider the evidence regarding Plaintiff's mental health impairments. In particular, ALJ Shillin did not give sufficient weight to the evaluations and opinion evidence of Plaintiff's treating psychologist, and thereby reached a conclusion that Plaintiff had never experienced exacerbation of her symptoms.

In evaluating Plaintiff's mental health impairments, ALJ Shillin noted "a onetime mental status examination from January 2014." (R. at 20.) She then cited findings from the January 2014 visit describing Plaintiff as alert, with normal affect and intact insight and judgment. (R. at 21.) These findings came from notes from three separate visits to Dr. Waldron.[10] (*See* R. at 306–09 (January 2014); R. at 310–14 (January 2015); R. at 315–18 (April 2015); *see also* Def's. Br. at 7–8.) Contrary to the ALJ's conclusion, each visit included its own mental status exam. (*See* R. at 311–13, 316–18.) Moreover, the January 2014 visit reflects a number of negative findings, including speech described as evidencing "excessive volume," affect not described as "normal" (R. at 21) but rather "restricted," mood described as "depressed and anxious," and insight described as "partially intact." (R. at 307–08; *see also* Def.'s Br. at 8.) The later two mental status exams, conducted after Plaintiff resumed a psychiatric medication regimen, showed improvement and largely unremarkable or normal findings. (R. at 311–13, 316–18.)

---

[10] The Court infers a continuing clinical relationship beyond these three visits. In January 2014, Dr. Waldron prescribed Plaintiff Buspirone and Lexapro. (R. at 309.) In her "history of present illness" note in January 2015, Dr. Waldron noted that Plaintiff "is less depressed and anxious since we switched to Paxil." (R. at 310.) This strongly suggests that Dr. Waldron reviewed and changed Plaintiff's medication in the intervening year. Plaintiff's "Claimant's Medications" questionnaire from summer 2014 said her medications had already been switched to Paxil and Seroquel. (R. at 258.) Additionally, Dr. Gupta noted on May 30, 2014 "[Patient] denies any medication . . . at this time except her bipolar and anxiety medications prescribed by her psychiatrist Dr. Waldron." (R. at 342.) Plaintiff listed Dr. Waldron as her doctor on the "Claimant's Recent Medical Treatment" questionnaire in summer 2014, describing the treating period as "January 2014 ongoing." (R. at 259.)

Dr. Waldron also provided a mental medical functional assessment dated April 1, 2015. (R. at 303–05.) ALJ Shillin misread her signature as "Kathy Walbern, Ph.D." (R. at 21), but it appears she signed Kathleen Waldron, Ph.D., APN-C (R. at 305).[11] (*See* Def.'s Br. at 8 n.3.) ALJ Shillin discounted Dr. Waldron's medical opinion evidence, writing "There is no description of Dr. Walbern's relationship with the claimant, and a review of the available medical records does not indicate Dr. Walbern examined the claimant on any regular or consistent basis." (R. at 21.) However, the Record indicates that Dr. Waldron had a continuing clinical relationship with Plaintiff as her mental health provider, and that ALJ Shillin's decision to give her medical opinion little weight would not be supported by substantial evidence. Notably, ALJ Shillin gave "some weight" to the opinions of state agency medical consultants at the reconsideration level (R. at 22 (describing opinions of Drs. Park and Campion)), neither of whom directly examined Plaintiff and both of whom affirmed the initial determinations as written. ALJ Shillin reasoned that their opinions deserved deference because they were based on a thorough review of the available medical records, reflected comprehensive understanding of agency rules and regulations, and were internally consistent. (R. at 22.) The Court concludes that because she was Plaintiff's treating mental health provider, Dr. Waldron's opinion should have been given greater weight—especially the portions that reflected her own narrative assessments quoted above noting that Plaintiff had severe anxiety, poor coping skills, and inability to handle stress. (*See* R. at 303–05.)

---

[11] Defendant takes issue with the ALJ's consideration of Dr. Waldron as an acceptable medical source because she is an advanced practice nurse (APN). (*See* Def.'s Br. at 7 n.2.). Nurse practitioners are categorized as "other sources" under a 2006 Social Security Ruling, but according to the Record and available public records, Dr. Waldron also holds a Ph.D. in clinical psychology and is licensed to practice. The Court thus refers to her as Dr. Waldron, and she is an "acceptable medical source" within the meaning of the applicable regulations and Social Security Ruling 06-03P. *See, e.g.*, 20 C.F.R. § 404.1502(a)(2) ("Acceptable medical source means a medical source who is a . . . Licensed psychologist . . . .").

ALJ Shillin wrote that "[d]espite reporting an onset date of February 2013, the claimant's medical records do not suggest she experienced any cognitive decline or exacerbation of her symptoms." (R. at 20.) However, she cited only the 2007–2009 medical records of Dr. Mitra. This conclusion would not be supported by substantial evidence. The Record reflects both subjective reports and objective medical evidence that Plaintiff did experience periods of exacerbated symptoms after the 2012 car accident, especially when un-medicated.

For example, in May 2012 Dr. Menkin noted that Plaintiff reported anxiety, worsening depression, as well as difficulty with sleep. (R. at 286.) She also reported headaches since her car accident. Plaintiff's own functional report, Douglas Smith's functional report, and Plaintiff's testimony about the post-accident period reflect that her anxiety and depression had both increased after her car accident, becoming so debilitating that she could not focus at work, lost her job, and stopped driving. Though ALJ Shillin reported that Dr. Makhija described Plaintiff's mood during the 2013 mental status exam as "anxious" and "cheerful" (R. at 18), she omitted the part of the sentence which described her as "tense and at times slightly depressed" (R. at 293). In 2014, Dr. Waldron's mental status exam noted Plaintiff's restricted affect, depressed and anxious mood, partially intact insight, and that Plaintiff reported hearing phantom noises in the middle of the night (R. at 306–08)—all at a time when Plaintiff was not receiving psychiatric treatment. In the context of Plaintiff's medical history, this reflects a period of exacerbation of symptoms; once she resumed a medication regimen, her symptoms improved. (R. at 310–18 (noting improvement on Paxil, medicine helping her to not get too anxious or depressed).) Plaintiff also reported migraines to Dr. Gupta in 2014, and he prescribed Fioricet.

Overall, the limitations from Plaintiff's general anxiety disorder, panic attacks, and major depression were not sufficiently evaluated at step three and thereafter. The court concludes that it must remand this case for further consideration.

### B. ALJ Questioning of the Vocational Expert

Having determined that the decisional RFC was not supported at significant points by substantial evidence, the Court need not consider Plaintiff's additional argument that the ALJ committed legal error in questioning the VE at step five of the analysis. Of course, any questioning of a VE must account for all relevant limitations in the decisional RFC in order to have benefit to the ALJ in determining the availability of viable jobs for someone with the plaintiff's limitations.

### CONCLUSION

For the reasons stated above, Defendant's decision is to be vacated and remanded. The Commissioner is requested to conduct a new hearing. An accompanying Order will follow.

Date: May 1, 2018

ANNE E. THOMPSON, U.S.D.J.